GREENMAN *v.* GILLERMAN'S ESTATE.

1. PARENT AND CHILD—SUPPORT AND MAINTENANCE—EVIDENCE—DIRECTED VERDICT.

    In an action by the natural mother against the estate of an adopting father for the support and maintenance of the adopted child, the action of the trial court in directing a verdict for the defendant is erroneous, as the evidence, considered most favorable to plaintiff, showed that both claimant and decedent expected he would at least contribute to the support, of the child.

2. SAME—ADOPTION—LIABILITY FOR SUPPORT.

    A person adopting a child under section 11640, 4 How. Stat. (2d Ed.), stands in the place of a parent to such child and is liable to all the duties and entitled to all the rights of a parent.

Error to Kent; North, J., presiding. Submitted June 21, 1915. (Docket No. 80.) Decided September 28, 1915.

Esther Greenman presented a claim against the estate of August Gillerman, deceased, for the support of an adopted child. From an allowance of the claim in the sum of $266.75, the administrator appealed to the circuit court. Judgment for defendant on a directed verdict. Claimant brings error. Reversed.

*E. A. Maher,* for appellant.
*Corie C. Coburn,* for appellee.

MOORE, J. The claimant presented against the estate of August Gillerman, deceased, a claim for the board, clothing, and care of Florence Gillerman from August 19, 1911, to August 20, 1913. The claim was allowed in the probate court at the sum of $266.75. Upon appeal by the administrator to the circuit court, the cause was brought on for trial before a jury and the trial judge directed that a verdict be entered disallow-

ing the claim.   The case is brought here by writ of error.   The sole question is:   Was the judge justified in directing a verdict?

In June, 1906, Mr. and Mrs. Greenman were very poor.   Mr. Greenman was a dissipated man and had been away from his family for about three years.   On the 6th of June, 1906, Mr. and Mrs. Gillerman by proceedings in probate court formally adopted Florence Greenman, who was then five years old.   Mrs. Carrie Gillerman became insane about 1910, and later died. Florence was then for a time in the family of Mr. and Mrs. John Edwards, where Mr. Gillerman boarded, and he paid for her care.   After a time Mrs. Edwards' health failed, and Florence was taken to the Blodgett Home, where Mr. Gillerman paid for her care.   Later she was returned to the Edwards home for a little time, when, because of the ill health of Mrs. Edwards, it was arranged with the claimant to take care of her. When this arrangement was made, the child had been with the Gillermans so long that she did not know that the claimant was her mother.   Some time after this arrangement was made Mr. Gillerman married again. He was for a long time out of health, and later died. His estate consists of money paid by the railway company for injuries which caused his death.

The circuit judge was of the opinion that the case was controlled by *Thorp* v. *Bateman,* 37 Mich. 68 (26 Am. Rep. 497), and for that reason directed a verdict in favor of the estate.   Counsel for appellee insist that not only is the case within *Thorp* v. *Bateman,* but that it is also within *Harris* v. *Harris,* 106 Mich. 246 (64 N. W. 15), *Decker* v. *Kanous' Estate,* 129 Mich. 146 (88 N. W. 398), *Rodgers* v. *Lamb's Estate,* 137 Mich. 241 (100 N. W. 440), and *In re Colburn's Estate,* 153 Mich. 206 (116 N. W. 986, 126 Am. St. Rep. 479), and that judgment should not be disturbed.

The case is a peculiar one in its facts.   It should be

decided upon the status of the arrangement between the adopted father and the natural mother, coupled with the obligations growing out of those relationships. There is no question but that Florence was legally adopted by Mr. Gillerman, and his duties to the child then became fixed by the statute. She went to live with him, and he supported her until after the death of his wife and until Mrs. Edwards, with whom Mr. Gillerman boarded, became so ill the child could no longer remain there.

Mrs. Edwards testified that she went to see Mrs. Greenman at Mr. Gillerman's request.

"He asked me if I would do him that favor, to go there, and I did.

"Q. What was the reason the child went away from your place, or was going away again?

"A. I was sick at the time and unable to take care of her. Mrs. Greenman came to my place to see Mr. Gillerman the next morning after I saw her. I heard some talk between Mr. Gillerman and Mrs. Greenman at that time. I did not hear much of the conversation, but I heard him tell her that he would help her to take care of Florence, and that she would never want. Florence was taken to Mrs. Greenman about a week later. She remained at our place in the meantime. I heard Mr. Gillerman say to Florence that he was going to take her to her mother, and she said that she did not want to go there, because she was not her mother. After the child was taken to Mrs. Greenman, Mr. Gillerman continued to live at our house. While the child was living at our house Mr. Gillerman paid for her board. He also paid for her board at the children's home. While Florence was in our house Mr. Gillerman was there every day. He worked during the day and came home to dinner. Florence was attending school at that time. Mr. Gillerman purchased her clothing. I did her laundry work."

Florence Gillerman was a witness. She testified in part as follows:

"Q. Who did you go there [to the claimant's] with in the first place?

"*A.* My papa, Mr. Gillerman.

"*Q.* Did he talk with you about taking you there before he went there?

"*A.* Yes, sir.

"*Q.* Did you know Mrs. Greenman was your mother at that time?

"*A.* Yes; just the night before he took me there.

"*Q.* Had you understood that you was an adopted child of Mr. Gillerman?

"*A.* No, sir.

"*Q.* Had you supposed that you were his own child up to that time?

"*A.* Yes, sir.

"*Q.* Had you ever seen Mrs. Greenman?

"*A.* Yes; she worked at Mr. Edwards'.

"*Q.* Do you know whether she depends on her work for her living?

"*A.* Yes, sir.

"*Q.* Where did Mr. Gillerman talk with you first about taking you there?

"*A.* The night before he took me there he said that I should be a good girl, and when I got bigger he would come and get me.

"*Q.* Who went with you when you went to Mrs. Greenman's?

"*A.* Mr. Edwards and papa.

"*Q.* By 'papa' you mean Mr. Gillerman?

"*A.* Yes, sir.

"*Q.* What did you hear said there when you got there? Did Mr. Gillerman talk with you there?

"*A.* Yes, sir.

"*Q.* Did he talk with Mrs. Greenman?

"*A.* Yes, sir.

"*Q.* What did he say to you there?

"*A.* He said he would help me along and buy me some clothes as soon as he got some money, and see that I had a good education.

"*Q.* What did he say to Mrs. Greenman?

"*A.* I don't know; I was crying."

John Edwards testified in part as follows:

"Florence lived in our family better than a year. August Gillerman lived there at the same time. Florence did not live there continually. She was at the

Blodgett Home for one month. I guess that is all until she went to her mother's. I went with Mr. Gillerman when Florence was taken to Mrs. Greenman's.

"*Q.* What did he say, or did he say anything, about his purpose in taking her there, to you or in your hearing?

"*A.* Why, I did not pay much attention to it at that time. He spoke about leaving her there. I don't know just what the conversation was.

"*Q.* Did you hear any conversation between Mr. Gillerman and Mrs. Greenman when he left Florence there?

"*A.* Not that I remember; no.

"*Q.* Did you hear any talk about it at all.

"*A.* Nothing any more than he would look after her and see that she did not want for anything; that is all I remember of him saying.    *    *    *

"*Q.* As a matter of fact, you never heard Mr. Gillerman say anything to Mrs. Greenman about his paying her, did you?

"*A.* No, sir.

"*Q.* The only thing you heard Mr. Gillerman say was that he would take care of the child?

"*A.* Yes, sir.

"*Q.* What was that?

"*A.* That was the night he took her home. She sat on his lap and cried, and he cried himself and he promised her that he would never see her in want."

At the time of the arrangement the claimant was still very poor and was making a living by taking in washings and going out to wash. Her husband was then at home occasionally, but remained dissipated and did but little for the family. Later he was sent to prison, and the claimant got a divorce from him. It is claimed there was a paper showing claimant was willing to readopt the child. She attempted to testify about this, but was not allowed to, because of the objection of counsel for appellee. The paper does not appear in the record, but it does appear that no proceedings were had in probate court.

We have purposely quoted the testimony most favor-

able to claimant. The difficulty of showing what the arrangement was is apparent, as no one who was taking notice was present when it was made, except Mrs. Greenman, whose lips are sealed by the statute, and Mr. Gillerman, whose lips are sealed by death. Enough does appear, however, to indicate that Mr. Gillerman expected to at least contribute to the support of the child, and that the claimant expected he would do so.

A reading of the cases relied upon by the appellee will show them distinguishable from the instant case. When Mr. Gillerman adopted the child the statute (4 How. Stat. [2d Ed.] § 11640) fixed his relations toward it, "whereupon  *  *  *  the person or persons so adopting such child shall thereupon stand in the place of a parent or parents to such child in law, and be liable to all the duties and entitled to all the rights of parents thereto,  *  *  *  the same as if he or she were in fact the child of such person or persons." The obligation of a parent to support a child is discussed in *Courtright* v. *Courtright,* 40 Mich. 633, and *Finn* v. *Adams,* 138 Mich. 258 (101 N. W. 533, 4 Am. & Eng. Ann. Cas. 1186).

We think the judge erred in stating, as a matter of law, that Mr. Gillerman was relieved of the duty of supporting this child, and that it devolved upon the claimant.

The case is reversed, and a new trial ordered.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.